McAvoy, J. (dissenting).
This controversy heard and determined by arbitrators had to do, primarily, with the alleged breach of a contract of agency between appellant and respondent, whereby the respondent was appointed the exclusive sales agent of the appellant for nearly all of its products. There were two contracts, the first relating to coke and pig iron, and the second to chemical by-products. There was also a supplemental contract which covered sales of coke by retailers which was not contemplated in the first contract.
The contract provided that all sales of the products of the appellant were to be made for the account of the appellant as principal; the credit risks were assumed by the appellant, and respondent was to be paid for its services on commissions on a certain day of each month which was specified in the contract. The com,mission was to be paid by the principal from its manufactory at Troy, N. Y.
These clauses of the contract were the subject of interpretation by the arbitrators: “ The sales agent, however, in the sale of said pig iron and coke shall at all times act in accordance with and be governed by such sales policy as to prices, tonnages, times of delivery, specifications of products, terms, credits, etc., as from time to time during the fife of this agreement may be determined by the company, provided the sales agent from time to time is notified of such sales policy.”
The paragraph relating to the payment of commissions upon the products sold and shipped by the company during any month was also a prime basis for appellant’s contention before the arbitrators that it was justified in discharging the sales agent as its employee and repudiating the contract to pay commissions on its sales to this exclusive agent. This is the 4th paragraph in the contract and provides that “ The sales agent shall bill and collect for account *425 of the company all sums due and payable with respect to sales of pig iron and coke made hereunder by the sales agent as aforesaid, and shall make prompt remittance to the company of all sums so collected by the sales agent.”
Shortly after the beginning of performance of the contract discussion arose as to how the agent should remit collections after the shipment of the products. The agent adopted the practice of retaining funds collected by it for the principal’s account, placed them in its own banks, used them in its own business and kept a false set of books whereby the principal was deceived as to the agent’s methods. There was no dispute as to this proof. A summary statement of the various accounts of cash which came from unremitted collections for the principal shows that from August 31, 1926, to - May 31, 1927, the agent had deposited in its bank more Hudson Valley Corporation funds than the total amount of moneys which it had in its banks and had spent large sums' of Hudson Valley Corporation funds in its own business, and had a demand been made at any one of those times for the balance due the Hudson Valley Corporation which, under the contract, was to be remitted “ promptly,” that demand could not have been met.
On November 13, 1925, the agent was notified that appellant’s executive committee had interpreted the provisions in the contract with respect to remittance of funds, to the effect that the petitioner should deposit the collections for the products in a separate bank account in the name of the principal, or in the name of the petitioner as sales agent for the appellant. The president of the agent was present at the time that the board of directors adopted this interpretation, and made no objection.
On August 19, 1926, petitioner received collections aggregating $74,580.80 for the proceeds of sales which had been made for the account of the principal, and which had not been remitted. Demand was made on petitioner for this money and it admitted that it was without funds to pay.
On August twenty-fifth —■ six days after —• a resolution was passed by the executive committee of the principal, requiring the agent to deposit directly in the bank account of the principal in Boston all moneys collected for the account of sales for appellant, and that deposits should be made in twenty-four hours after collection by the agent, and duplicate deposit slips should be mailed to the principal of all checks and acceptances.
On August twenty-seventh — two days following — a copy of this resolution was sent to the agent, stating that the principal had designated the American Trust Company of Boston as the depositary in which the money should be deposited.
*426 The respondent wrote on August thirty-first that it had received the letter of the twenty-seventh, and would make all deposits of money collected for the account of the principal directly into the account in the American Trust Company, starting September 1, 1926; that it noted what was said regarding remittance statements, and that these would come forward to the principal promptly, together with the requested duplicate deposit slips showing the receipt by the bank of the moneys.
The agent deceived its principal thereafter into believing that it was carrying out this request in the resolution of the executive committee, and the statement in its own letter of August 31, 1926. While the agent made deposits in the account in the American Trust Company in the name of the principal, and sent duplicate deposit slips to the principal, and a remittance sheet, they were prepared in such manner as to indicate that as fast as collections were made by the agent, they were deposited in the American Trust Company account. The fact was that after September 1, 1926, the agent did not deposit the moneys collected for the account of appellant into the American Trust Company, or any other bank account of the principal, but deposited a large part of the remittances received from the sales of appellant’s products in petitioner’s own bank account. After writing the letter of August thirty-first, the agent continued to discount notes given by customers in payment of sales of the principal’s products and used the proceeds to further its own business.
After September 1, 1926, the agent did not have in all of its bank accounts combined balances equivalent to the collections which it had theretofore received on account of sales of appellant’s products, and which collections the agent deposited in its own bank accounts. After September 1, 1926, and down to June 4, 1927, a large portion of these moneys collected from the sales of appellant’s products by the agent were used in its own business. The aggregate amount collected from the sale of products, and which the agent' failed to deposit as it agreed to do in the bank account of the principal, from September 1, 1926, to June 4, 1927, the date of- the termination of the contract, was $1,604,301.67.
This was concealed from the appellant by a system of bookkeeping which did not reveal the fact. The agent’s cash book, customers’ ledger and general ledger did not show the date of receipts by petitioner of remittances in payment of goods after the date of the agent’s letter, September 1, 1926. The dates shown on the agent’s books — apparently kept in a regular manner — were not the dates of the receipt of the moneys, but were dates of the deposits by the agent of the moneys in the American Trust Company account, which was that of the principal.
*427 In February, 1927, the principal sent a representative of a public accountant to examine the agent’s books under the contract provisions, and asked for a submission to the accountant of all the books. There were submitted the usual and regular books, and an examination of these disclosed that, with the exception of certain items mentioned by the accountant, the dates of the deposits checked with the dates of the receipt of the moneys by the agent, as appeared by petitioner’s books. The accountants were also deceived because of these false books.
In addition to keeping regular and usual cash books, customers’ ledgers and general ledgers, the agent kept a secret memorandum in lead pencil of the dates of the actual receipts, and these sheets were not shown to the accountant; and only by examining this memoranda could it have been found that the entries in the regular books were fictitious, and that the agent even after writing its letter of August thirty-first, agreeing to make all deposits in a fund of the principal, was using its principal’s moneys in its own business, and had spent from time to time portions of it, so that it had not on hand money sufficient to pay over to appellant the collections made for its account.
These facts are not disputed, and one of the arbitrators who voted for the award to the agent of over $302,000, said that the sole criticism for this conduct is a want of frankness in the matter; the president of the company acquiesced in the company’s request in good faith (i. e., to put the money in a deposit account of the principal), but when he changed his mind he did not notify the company.
Thus, it was submitted to the arbitrators to decide whether this handling of the principal’s money by the agent in direct violation of the instructions of the principal, and in violation of the agent’s own statement that it would carry out the instructions of the principal, afforded a proper ground of discharge from employment, the contention being, on the part of the principal, that if the agent deliberately failed to make prompt remittances called for by the contract, and deliberately deposited the moneys in its own account and used them in its own business, such actions of an agent, irrespective of the deceit practiced in the alteration and fixing of the books, warranted a breaking of the agency contract and a discharge of the agent.
The agent’s position was that it was not really an agent, but an independent contractor, but, if it were an agent, it was one of a character different from the ordinary agent to sell; that it was entitled to deposit the money in its own account and to use it in its own business because of a custom or usage among sales agents.
*428 The arbitrator who was appointed by the agent contended that there was no consideration for the statement by the agent that it would carry out the instructions of the principal with respect to the deposit of money daily in a bank account designated by appellant, and, therefore, the contract was not amended in that particular by the request of the principal and the acquiescence of the agent; that the contract contained no specific provisions as to how the moneys should be deposited, or as to when they should be remitted other than that they were to be promptly remitted.
The arbitrators then received evidence outside the instrument to explain it. When the agent’s president was testifying it was asked of him to state his understanding of who owned the moneys collected for the goods of the principal by the agent, and the president stated that he did not have to deposit the specific moneys, and that it was not a custom of the trade in any way at all. The agent also argued to the arbitrators in its brief that the clause relating to the collection was suggested by the agent’s president and adopted by the counsel for the principal after full discussion and investigation; that this method of collecting and remitting was in accordance with the usual customs and methods employed in this fine of . business.
It was argued by the principal that no custom or usage could set aside the ordinary rules of law applicable to the duties of an agent to his principal, and that the diversion of funds of a principal by an agent could not be justified by any alleged usage or custom. It apparently was thought pertinent by. the chairman of the arbitrators to comment before them when they assembled for decision, that he had learned from the president of the sales agent of the General Electric Company as to the method employed by them in the handling of principal’s moneys.
It is stated in the affidavits of the arbitrator appointed by the principal that one of the issues presented by the arbitration was whether the petitioner had properly or improperly deposited funds which it had collected in the capacity of sales agent for its principal to its own profit and gain and used the same in its own business. This arbitrator states that after the evidence had all been submitted and both sides had closed, the arbitrators met on a day set in the morning to consider their decision. Whether the agent had a right to use these collections in the manner indicated was one of the first things discussed. The difference arose between the two appointed arbitrators as to whether such a right existed in the agent. The chairman of the board of arbitrators, whose misconduct is said to be sufficient to set aside the award, then reported to his associates that he had spoken to a friend of his, an official of the Graybar Corpora *429 tion, and this friend informed him that the Graybar Corporation was sales agent for the General Electric Company, and that it was the practice of the Graybar Corporation to collect the proceeds of the sales of the General Electric products, deposit them in its own banks, use them in its own business and make remittances from time to time to the General Electric Company. It was then stated to the chairman of the board, by one of the arbitrators, that he did not consider such information proper evidence to be considered by the arbitrators in arriving at a decision, and that he considered that the chairman had apparently been influenced in reaching a decision, unconsciously, by this conversation; and that, since the chairman did not know the terms of the contract between the Graybar Corporation and the General Electric Company, what they did could have no bearing on the rights in this instance which were to be determined from the evidence and the contract, and that, in any event, the principal had had no opportunity to meet this evidence. It is then set forth, that after luncheon, and in the afternoon discussion, the chairman of the arbitrators stated that, while he had spoken to an official of the Graybar Corporation, he had reached his conclusion already that the agent had a right to use the funds in the manner it had, and that the information he had received from the official of the Graybar Corporation had not influenced him.
The arbitrator appointed by the principal then stated to the chairman that, since he had made these inquiries and mentioned the result of the inquiries at the conference of the arbitrators for decision, such information must have had an influence in his decision. The precise point that was being discussed was whether or not the agent had carried out its contract obligation with respect to the handling of the funds. At that time the other arbitrators were told by the chairman that he had obtained independent information from another sales agent with respect to the method in which other sales agents handled the funds of their principals. If he were not influenced and considered this conversation of no importance, and was not impressed by its bearing on the matter before them, it is impossible to infer why he spoke about it to his fellow-arbitrators at the time of their consultation for decision. I do not think that it is any answer to this claim of misconduct to say that this conversation (fid not influence the arbitrators’ decision, because on that matter no contradiction could be brought about by any affirmative proof. It seems to me that the action was such misconduct as to render the award invalid, and to give the right to the principal to have the award vacated.
Although there is no positive proof that the arbitrator was *430 influenced in his opinion by the conversation, there is' no means of having such proof in such cases. Whether he was influenced or not might not have occurred even to himself. A fact of this kind is seldom perceptible or consciously produced. Influence of this character may be imperceptible and unknown to the subject. The rule is to hold that when it appears that there has been any conduct calculated to result, and which has probably resulted, in influencing the arbitrator outside of matters proper for his judgment, an award should be set aside.
The rule is very strict excluding communications to an arbitrator ex parte after the case is submitted, and when such communication is established which may affect the result it is not usual to enter into any inquiry as to whether the arbitrator was in fact influenced by it or not. After arbitrators hear testimony on a point material to the decision and after the hearing is concluded, they cannot, without the knowledge and consent of the parties, seek or receive opinions on the same point from a source which they apparently consider authoritative, and, by communicating it to their fellow-arbitrators, bring it to bear on their judgment without opportunity to the parties or the other arbitrators to cross-examine the person or judge of his ability as a witness, or even to repudiate his testimony.
I think that the judgment should be reversed, with costs, and the award vacated.
O’Malley, J., concurs.
Judgment and order affirmed, with costs.